Samuel Giancarlo v. UBS Financial Services at Al. Good morning, Your Honors. May it please the Court, I'm David Augustus and I'm here on behalf of the appellants, Samuel Giancarlo and Dr. Alsina. This is a unique securities case in the context of a Section 10B claim, and that makes this Court's decision an extremely important one. This is a case about silent fraud and how this Court rules will determine whether securities firms like UBS can escape Section 10B liability to their own retail brokerage clients simply by maintaining a code of silence. The trial court dismissed the appellant's Section 10B claim on the basis of three erroneous findings. Those three findings are what this appeal is about. The first two relate to the deceptive conduct element of a Section 10B claim. The third relates to the scienter element. So the first finding concerns UBS's duty of disclosure. The second finding concerns the partnership or the joint venture relationship that exists between the UBS defendants. And the third finding concerns UBS's extreme departure from the industry standard that applied in this context. And I'd like to address each one of these three in turn. So beginning with the duty of disclosures, the parties agree that deceptive conduct for the purposes of a Section 10B claim includes a defendant's failure to disclose material information when it is under a duty to disclose. From Affiliated Ute through Shirella and Stoneridge and beyond, the case law on this matter is settled and clear. The parties also agree that the rules and regulations of the security industry's unique self-regulatory scheme govern the relationship between UBS and the plaintiffs or appellants in this matter. So for example, the parties agree that the disclosure rules of the NYSE of the former NASD govern the relationship that UBS had with its retail brokerage clients. The parties also agree that these rules obligated UBS to act in certain ways with respect to its retail brokerage clients. What led the trial court to its error was its understanding that UBS could commit silent fraud if and only if UBS owed the plaintiffs a comprehensive fiduciary duty. On pages 119 and 20 of the order of dismissal, which is 92, 23, and 24 of the record, the trial court wrote that for the plaintiffs to have a Section 10B claim against UBS, that UBS's duty to disclose must be, quote, to require UBS to act only in the investor's self-interest, end quote. This is not and this never has been the law regarding silent fraud under Section 10B. The cases regarding nondisclosure speak in terms of a duty to disclose. They could have spoken in terms of a fiduciary duty, but they do not.  And so the question is whether or not there was a duty that UBS had to its retail brokerage clients to speak. What the trial court should have done. Mr. Augustus, the district court wrote a very thorough and long opinion, which I've read, and I think it's probably correct. And your problem is you're the only defendant that I see you could recover against would be the Payne Weber Company, the former Payne Weber Company. You can't just sue UBS. You have to show there is an entity by that name that has a definite legal corporate entity. As far as I can tell, there is not. You have UBS Warburg and maybe another one, and then you have UBS Payne Weber, which is a separate corporate entity. And you have not alleged that someone in that entity owed you a fiduciary duty and had a duty to disclose to you some non-record information about the financial status of Enron, which was doing business with the other two entities. So, I mean, you have to overcome a pretty solid case and opinion by the district court. If you just come in here and say UBS did this, UBS did that, you're going to lose us because I'm about convinced, maybe I don't know about my colleagues, that you have to focus on Payne Weber, which is the entity that dealt with, took orders and bought stock for your plaintiffs, stock in Enron, which you say they should have told them that Enron was in bad shape. Don't buy this stock. They didn't do it. Well, what is there in the record that shows that somebody in Payne Weber, the Payne Weber Corporation, had that knowledge and had more than just ordering stock and selling stock for these people? They had some kind of fiduciary duty, even if they didn't have the information, to tell the purchasers of the stock. Right. Thank you. And it was an interesting question to think about which way to start with the duty of disclosure or the joint venture relationships because both of these are required for the deceptive conduct element. So, if I may, about the joint venture relationship, the parties have alleged that UBS is a legal entity, that there is a de facto joint venture that exists because of the relationship between the various UBS defendants. UBS AG, UBS Financial Services, UBS Securities, LLC. Well, the judge said you didn't show that. You didn't prove that. And we contend that that was error. She started out by saying that you didn't, you may not have to pierce the veil of these three subsidiary corporations, but you didn't try to do that. Well, and with respect to the trial court, this is not an alter ego claim. The plaintiffs have never once considered this or alleged that this is an alter ego claim. We are not attempting to disregard the corporate fiction and pierce the corporate veil. And it's unfortunate that after 14 years, we were never once afforded a live audience with the trial court to discuss this matter before our complaint was dismissed. Because UBS's own public admissions and their own SEC filings set out exactly how their relationship is established. They have these, a number of different UBS entities coming together to form what they call themselves in their own public filings an admission that they have to sign off of under penalty of a felony. They have admitted in public records that they come together and that they operate as one entity called UBS or the UBS group. They have a number of boards and committees that oversee the sharing of resources and various things within these entities. So they have managing this one integrated group that they call UBS, their own language. Did they refer to it as a joint venture? They did not ever refer to it as a joint venture, but these are Delaware entities, at least UBS financial services and UBS securities. And so under an analysis, under Delaware law regarding joint venture, it meets the elements. There is this idea of a de facto joint venture. If you come together and you act and you do the things that a joint venture does, you are a joint venture de facto by a matter of law. And so they had one corporate center, they had, what's the authority for that? For a de facto joint venture? I apologize. I'm trying to see where I put my note on that. I do have it written. Oh, I'm sorry. It's Warren versus Goldinger Brothers. It's a Delaware 1980 case that set forth the sort of original de facto joint venture principle and listed the elements of a common purpose, a right of control, proprietary interest in the business, sharing in the profits, sharing in the losses, if there are any. And they had, as I said, members. Did you show that? Did you show that these three entities shared in profits? Well, Your Honor, this is a part of the public filings, and under this court's precedent the trial court should have considered their public filings. It is the case that when the plaintiffs came back later and asked for leave to amend, this is one of the elements that they sought to expand by incorporating, gosh, I forget how many pages it is, but it's like 20, well, maybe not that much, but let's say in excess of 10 pages, of all of their public filing information that sets out the different members of the board, the fact that there's this group executive board, group managing board, group risk committee, group president, group chief financial officer. That's in the record now. So that is in the amended complaint that the plaintiffs sought to have filed, to have amended. That was denied. And based on, according to the trial court, delay that was experienced in the Newby case, the primary Enron MGL case. But, again, all of these things are part of UBS's own filings. And if you look at plaintiffs first or second. But I think the question was whether or not there's some evidence of the sharing of profit and loss. Yes. Are you telling me about group boards and committees? Well, right, and so when you look at their financial statements and how they allocate profits and losses amongst the different entities, there is that. And there's also, we incorporated testimony from the employees that talk about how they expense one another's companies, how they offer their resources across entities. Most of the employees don't even know who they work for. They don't know who their paycheck is. And they would say, well, you know, it's actually just direct deposit. I don't know what UBS entity I work for, and it doesn't matter to me because it's all just UBS. What happened after the stay expired from 2012 to 2016? So the stay expired on August 11, 2011. And a week later, plaintiffs filed their motion for leave to amend. And then about a month later, not having heard anything from the court, we were kind of expecting. I mean, obviously the court had a lot of work to do with regard to Newby and the matter that was sent back to her. And so, you know, patience was in order. Not having heard anything about how our case was going to proceed, we filed a motion for a scheduling order on September 20, 2011, and never really heard anything. A year goes by, almost a year or six months. March of 2012 is when we received an order denying our motion for leave to amend. Another, you know, over a year goes by. We don't hear anything. We file a motion for a joint status report. That was denied. We then filed shortly after that a motion to perpetuate testimony because, frankly, our experts are getting very old. After that, now another year goes by, which was granted, and we were able to perpetuate the testimony of some of our experts. You know, and that's one of the unique things about this case is fact discovery is complete. Expert discovery is complete. We were dismissed on a motion to dismiss, I mean, on a failure to say that, you know, 12B6 motion, which usually is the beginning of a case. And here we are now at the end of a case, and frankly, we're ready for trial. We are ready to go. And one of the things that I would say about the amendment is the Second Amendment complaint that was requested has everything in there. Every piece of evidence is footnoted. I mean, it is the case. And from our perspective, why, if you're going to dismiss a complaint, don't you give the party that opportunity to state the best case that they can state and consider it on those facts as opposed to a very old complaint that could have been approved of them? So the dismissal did not include the most recent amended complaint. That's correct. So it was based on the first amended complaint. I see my, oh, wrong line. It was based on the first amended complaint, and there was denial for leave to amend the second amended complaint, which has all of the allegations concerning the joint venture, has the law in there, has the testimony relevant to that issue from the UBS employees whose depositions were taken. One of the big reasons why plaintiffs felt like they needed to amend their complaint, you know, first of all, after the motion to dismiss, the first amended complaint comes back and denies essentially everything that UBS has already admitted in its public filings. So we say, okay, well, we have an issue here that we need to address further. But more importantly than that is the second amended complaint was seeking to incorporate the testimony of Andrew Fastow, which was not available to plaintiffs when they filed their first amended complaint. And the testimony was deposed in 2006. Oh, yes, but subsequent to the filing of the first amended complaint. The first amended complaint was in August. Fastow was. You didn't file it into the record. I'm sorry. You didn't file it into the record as part of your motion. The second amended complaint? The deposition of Fastow. No, but in the second amended complaint, we quote extensively and reference his testimony, specifically the testimony where he talked about how all the conversations that he had with the other banks, he had those same conversations with the UBS investment banker, a relationship banker, and others, concerning Enron's financial needs and shortcomings and then the kinds of transactions that they would do in order to fill those holes. And I just want to say before, with 20 seconds left, that those transactions, this is not a scheme liability case. Those transactions are in the complaint for purposes of showing that UBS knew what we say they knew and that they had material information that they were under a duty to disclose to their clients as they were purchasing Enron debt securities, which is exactly the opposite of what UBS was doing. I'll reserve the remainder of my time. Thank you. Thank you, sir. Mr. Gifford, how do you pronounce your name? May it please the Court, Robert Gifford for UBS AG, UBS Financial Services, which was formerly Payne Weber, and UBS Securities, which was formerly UBS Warburg. This case, Your Honor, is unique. It's an unprecedented case, and what the plaintiffs would like to do here is ignore this Court's law, the Supreme Court's law, and have this Court go down a road no Court has ever gone down before. These are three separate entities. They did not plead in their complaint anything about piercing the corporate veil. It's important to remember that the plaintiffs took 40 depositions in this case before they filed the complaint in August of 2006, and then they waited literally five years to seek leave to file an amended complaint. The only thing that happened, and that was pretty much within a year or within a month after they filed their amended complaint, which is the operative complaint here, was they took the testimony of Mr. Fastow, who was Enron's CFO, and he said, and I urge the Court to look at page 9852 of the record, that no one at UBS, he didn't know anything about the accounting risk at Enron, and that UBS meaning UBS Warburg, UBS Payne-Weber. Now, let's go to the point that Judge Dennis started with. What did anyone at UBS Payne-Weber know about the accounting fraud at Enron? Absolutely not. There's no allegation to that effect. Is there any allegation that anyone at UBS Warburg, the investment banking side of UBS, knew about the accounting fraud? No, there isn't. Not any particularized allegations sufficient to satisfy 9B or the Private Securities Litigation Reform Act. What the plaintiffs say, and they speculate based on some transactions that UBS engaged, and UBS was not a big player at Enron. It did an equity forward transaction before the merger of UBS AG and Payne-Weber, and then some bond offerings where they were not the lead underwriter, and then they had 3 percent of a credit facility. Now, from that they claim somebody at UBS must have known about the accounting fraud. Well, Mr. Fastow at the deposition said no. He said he didn't know about anybody at UBS knowing about the accounting fraud. Now, they have a problem. UBS Warburg is on one side of a Chinese wall that's set up by SEC regulation. UBS Payne-Weber is at the other side. It would have been illegal had anybody at UBS Warburg provided nonpublic information to the retail side of the bank, and that's another fact that the other side just completely ignores. Now, the Supreme Court in the Janus case recognized that you need to look at the separate forms, and in that case it had to do with a mutual fund, the Janus Mutual Fund and its investment advisor, and said you couldn't just lump them together as to one, which is what the plaintiffs would like to do. without pleading any reason why other than saying, well, the bank says it's an integrated firm. Well, every major financial institution in America and the world, many of the leading ones, have a brokerage firm, a bank, and a retail function, and what these folks are saying is that if there's some information somewhere in a bank and UBS had 60,000 employees, that information needs to be told to the brokers when they're selling securities. Now, another problem with their case. Isn't that correct? If they know that one of the entities that they're selling is corrupt, about to go under something, don't they owe it to their clients to let them know this is not a good thing to purchase? Well, Your Honor, let's go back to the first premise of your question. There's no particular — Well, one can't tell someone something else, but if they know something bad about the stock that the other two entities are selling, why wouldn't they owe a duty to their client? In this case, there's no allegation whatsoever that anyone at UBS, Warburg, knew about accounting fraud at Enron. They speculate that they did based on doing really minor roles in transactions. Number two, had they known whether they could have gone over the Chinese wall and told on the brokerage side? I don't know the answer to that question. I think maybe — I thought you just said that they couldn't. My understanding is that if you have nonpublic information about an issuer, and this is on the banking side, they can't go and tell it to the retail folks because that would be trading on — that would be going over the Chinese wall that exists between the brokerage side and the banking side of the firm. I think there'd be some exemption for — But there's no allegation — there's no allegation here that anyone at UBS knew that. Okay. I was following up because you seemed to indicate that the wall would protect them. Well, but the other thing, Your Honor, is they took, in this case, 40 depositions, and so they examined all these people. They got all the documents. This is not a case where — it's an unusual case because of the way that the original Regents case and then the Supreme Court case sort of slowed — we were litigating and they were litigating a scheme liability case, and then ultimately the Supreme Court said that didn't work. So then they wanted to twist it into this new theory of some integrated financial services company. But in any event, they don't plead that anybody at UBS knew anything. Now, there's another point which is important, and the other side misses it. The Fifth Circuit in the Martinez case and the Romano case — Martinez is 1998, Romano is 1987 — made it quite clear that — and it's important to recognize that the plaintiff in this case had a nondiscretionary account at UBS, meaning that the plaintiffs, there's two of them, made the decision to buy the Enron notes when they did. And those Enron notes, as they — in the record, were 12 percent — you know, they were risky securities, but they made the decisions themselves. These were not in a discretionary account. And when you're in a nondiscretionary account, the Martinez and Romano case, as well as cases from the Tenth Circuit, the Eleventh Circuit, and also Texas courts, all make it clear that the obligation of the broker is limited to executing the investor's order. The broker does not have a duty to disclose. The broker does not have a fiduciary relationship with its customer. So this is not a case like Ute where there's — where based on the narrow circumstances of that case, the broker has a duty to disclose anything. Now, there's no allegation here that the brokers of these particular folks knew anything, knew anything about the Enron fraud, and they don't allege that. So that is another flaw in this case. And it would be a massive expansion of Section 10b. The other folks say, well, you know, the broker doesn't act fairly or doesn't follow standards of the profession or doesn't follow the SRO rules. Well, that's not 10b. This is not a case where they are claiming that these were not suitable investments for these plaintiffs, were not in an NASD arbitration, or a FINRA arbitration. They could have brought something like that. They didn't do that. They're bringing a 10b fraud claim. And in a 10b fraud claim, you've got to plead the fraud. And the problem is, number one, there was no duty to disclose. Number two, there was no particularized allegation that anyone knew anything about Enron. We didn't consider any violations of those SROs or whatever you call them. They can be relevant in some way. We have never recognized a cause of action. That's correct, Your Honor. In the Miley case, which is 637 Fed Second at 333, and also the Yale Jolly case, 904 Fed Second 993, this Court has avoided what it rightly called the treacherous question of starting to apply SRO rules in the context of a Section 10b case. And obviously, the plaintiff could have brought an NASD arbitration and elected not to. They wanted to bring a securities fraud case. I think the reason we're in the position that we are here is because, as I mentioned before, they originally wanted to plead this case as a scheme liability case. And then when the Supreme Court and this Court, in a case Your Honor is familiar with, the Regents case, said no, you couldn't have this kind of scheme liability, then they tried to switch to this theory of somehow, well, there's one giant investment bank or giant bank, integrated bank with an investment bank, a brokerage firm, and then a commercial bank, which would be UBS AG, and they all should be lumped together without pleading any facts that the corporate veil should be pierced in this case at all. They haven't pled anything other than, you know, citing statements by UBS about how they try to run an integrated financial firm. But that is not sufficient. So I think in terms of how the Court would resolve this case, number one, they don't plead with any particularity, any particularity, that anyone from UBS knew about the Enron fraud. That's sort of the pretext of their complaint. And if you look at the transactions, again, there were two equity-forward transactions where UBS, where Enron was essentially looking to hedge its risk on stock options of its employees, so that basically UBS promised to sell Enron its own stock at a certain price. And in fact, the stock went up higher, and so UBS owed Enron money, and then they restructured those equity-forward contracts. Those deals were done before UBS AG purchased Payne Webber, okay? Then the other transactions they talk about, one is called Osprey, the other one is called Yosemite. Those are transactions where UBS was not the lead underwriter. UBS, in the case of Osprey, it was a public 144A private placement transaction, not a secret transaction. Yosemite, UBS was not the lead banker. It was part of a group of six banks. They don't allege that UBS learned about the Enron fraud in connection with those transactions. And then UBS AG, the Swiss banking parent, again, 3 percent of a $100 million of a $600 million line of credit that I don't even think was actually exercised for something called Enext. So on the basis of all of that, they still don't have the particularized allegation that anyone at UBS knew, anybody at UBS Warburg or UBS AG or anybody at UBS Payne Webber knew about the Enron fraud. And, in fact, you know, Mr. Fastow, again, at 9856, said that he didn't discuss accounting or tax risks of Enron with anyone from UBS. I would note the plaintiffs rely on Mr. Fastow's testimony, and this is in your record at 9852, where he said, well, I discussed with all the bankers, including UBS, things like funds flows and debt and sources of income, and those are things that bankers normally discuss with clients all the time, and that's different than knowing about accounting fraud. So, again, they've got to plead in the first instance that someone at UBS Warburg or someone at UBS AG knew about the accounting fraud. They've got to show that these entities should be treated as one, even though they haven't pled that they are separate entities, and the Supreme Court has made quite Is there any allegation that UBS somehow had knowledge of the Enron fraud prior to acquiring Payne Webber and should have transferred that knowledge to Payne Webber when it acquired it or something like that? There's not a particularized allegation of UBS knowing. Anyone at UBS AG, anyone at UBS Warburg, because it's easy to fall into UBS, they're separate entities, knowing about the Enron fraud, and what they do, what the plaintiffs say is, well, they should have known about how the funds were going to be used on transactions, but there's a big difference between should have known how funds should have been used and actually knowing about it, and the other side doesn't identify a single employee at UBS Warburg or UBS AG who knew about the fraud, much less provide particularized allegations that that person knew about the fraud. And, in fact, what they're trying to do is contrary to this Court's decision in Southland, where this Court said you've got to have a particular person who knows about the fraud and you've got to plead it as to that person, not sort of taking snippets of information and saying, well, in sort of the giant mosaic, they should have known about the fraud. But, again, I go back to what I said. Separate entities, and then you fall back to the fact that under the Romano case and the Martinez case, both decisions that Judge Harmon relied upon, this Court has made it quite clear that a retail broker owes no duty to disclose anything to a customer that is not – there's no fiduciary obligation. And, in fact, in the – in fact, in the Regents case, Your Honor, in that case, in the context of looking at Ute, which is the case they rely upon, in a footnote, to your concurring opinion, agreed with the majority that they had established that the Ute exception, which is a narrow one, should apply. And under the theory that these folks are advocating, it would literally – it's a unique case that would literally upend the way that banks and securities firms operate in the United States, because there's absolutely – you know, all of them do banking business, they do investment banking business, and they have retail arms. And this idea that, you know, you have to look at the giant information in the entire bank and then lump it all together, and that all has to be disclosed to retail customers who own non-discretionary – who are trading in non-discretionary accounts, they can't cite a single case where any courts have done it. What you're telling me is when my stockbroker calls me and touts me on a certain stock, and I say, yeah, go ahead and buy it for me. Although, since he doesn't have any discretion to buy without talking to me, that's just an ordinary kind of a relationship, and I can't sue him if he knows something bad. If your broker knew something bad, you certainly could bring an NASD arbitration or now FINRA arbitration against that broker. You might be able to bring a 10b-5 action against the bank if the broker made a statement to you that was false. But these folks don't allege that the broker that they were dealing with made any false statement to them at all. So it's not like they say, well, the broker said there's nothing – that Enron is a great company, there's no accounting issues. They say that somebody else at UBS across a Chinese wall may have known something and they should have told the broker who then should have told it to you. And that's not a rule of law that's ever been accepted by any court, that there's some obligation like that. But again, the pretext for the obligation is that somebody at UBS – Warburger or somebody at UBS AG – knew something about the Enron fraud and they don't plead that after literally taking 40 depositions. If the court has no further questions – let me just raise one thing. On the question of leave to amend. Now, the court doesn't need to reach that issue if you dismiss the case as we believe you should. But here, number one, the notice of appeal in this case, and that's at 933 – Why don't we need to reach it even if we dismiss? Excuse me? Why don't we need to reach it even if – Well, because I think – well, a couple of reasons. Number one, it's not properly included in the notice of appeal in this case. The notice of appeal in this case was limited to Judge Harmon's decision that's on appeal on the motion to dismiss. The leave to appeal issue was decided – there was a deadline for filing a motion for leave to appeal in this case on August 18, 2006. The plaintiffs waited five years until August 2011 to seek leave to appeal. The only thing that had happened between when they filed their amended complaint and then their next amended complaint was the Fastow deposition. That was the only thing. The Stonebridge decision by the Supreme Court came down in 2008. They waited two and a half years even after that decision to seek leave to amend. And so it was late. But in terms of the actual notice of appeal that was filed in this case, they don't identify the March 2012 order of Judge Harmon denying them leave to amend in their notice of appeal, which is at 9337, 9339. And so this Court, we believe, doesn't have jurisdiction even to consider the issue of the amendment. But in any event, what's in the amendment with respect to Mr. Fastow is Mr. Fastow, as I said before, at 9856, said he didn't recall talking about accounting or tax risks with UBS. And in any event, allowing at this late date a brand-new motion to dismiss with 73 different people referenced in it about, you know, events that go back to, you know, before the year 2000. Motion to dismiss? Are you talking about? A motion to amend. I apologize. Motion to amend would be highly prejudicial to UBS. And in any event, they had all that information back in August 2006 when they filed their amended complaint. They had taken 40 depositions plus and done expert discovery. So they had their opportunity to make their best shot, and now they're basically just coming in and saying, you know, we want to file a new complaint, even though they waited literally five years after the deadline to move to amend. So it would be, number one, it's on terms of the amendment, it's not referenced in the notice of appeal, the decision which is a March 2012 order denying leave to amend in their notice of appeal. They waited too long to file their motion for leave to appeal, five years, including two and a half after the Stone Ridge decision. There's no good explanation for their delay. And the proposed amendment, you know, again, the only new fact is a deposition of Mr. Fastow, which doesn't help them. And it would be highly prejudicial to the defendants to deal with a new complaint years later, particularly given how long this case has gone on. So in sum, we think the Court should affirm, for the reasons stated by Judge Harmon, there's no particularized allegation anybody at UBS knew about the Enron accounting fraud, and more importantly, we think the two cases, Martinez and Romano, make it clear that a broker doesn't owe a duty to disclose absent making some false statement to the client, and they don't allege a false statement here. Thank you, Your Honor. So Judge Harmon wouldn't talk to the parties about this case? I think Judge Harmon had a very big, I think an important point, I think one of the reasons why this happened was the Newby case had the nine lead investment banks that dealt with Enron. UBS was sort of a tail that wagged a big dog. And so she didn't, you know, she dealt with us. You know, we filed motions. The case went on. And then, you know, and then she ruled on things. And it obviously took a while to get the motion to dismiss decided, but she doesn't have an obligation to give us oral argument on a motion to dismiss that I'm aware of or a motion for leave to demand. Thank you, sir. Thank you. Mr. Augustus. Thank you. I think one of the really important facts that's alleged and supported with the financial risk to Enron in the months leading up to Enron's bankruptcy, one of the very few entities out there that had such exposure to Enron and when Enron filed bankruptcy didn't have exposure to Enron. And I think that's a very important part of the story and understanding that UBS very well knew the situation at Enron. A couple of things to address is the legal restricted list, this idea of a Chinese law. You know, the group credit risk department and a number of other group departments sat above all of these UBS legal entities because it was the one who was managing their resources, managing how things would work. The way that the law set and sort of the standard in the industry is set up to handle these kinds of situations where you have knowledge in one side of your organization and duties to disclose in the other side of the organization is through the industry standard of a legal restricted list. And there's actually the expert depositions took place after the first amendment complaint was filed and actually UBS's own expert who testified after that filing testified that UBS had, if it had knowledge of financial manipulations at Enron, that they actually had a duty to report this to the SEC. But irregardless of that, they have this industry standard of the legal restricted list where you find out that you have material non-public information that you can't disclose because you have a duty not to disclose to your corporate client and yet you have a duty to disclose to your retail brokerage clients or others. You put the security on a legal restricted list. You put the issuer on a legal restricted list. It prevents you from trading in that security and it prevents you from publishing research relating to those securities. That's what they should have done. So for the scienter element of this claim, that's what they should have done. That's the industry standard. But of course they didn't do that because if they did put Enron on a legal restricted list, they couldn't unload $400 million of financial risk that they held. So that's one of the reasons I think that supports the idea that they did have knowledge from these transactions. And of course, then as I said, there's pages and pages of details regarding those transactions. Also, the list of names of people who are engaged in those transactions, Jim Hunt, the credit risk officer, Bill Glass, the head of North American Credit, Wendy Field, who was in loan origination, Karsten Berlage, who was an investment banker, Kimberly Blue, Michael Collins, David Kelly in house counsel. There's a number of people and their roles are explained in the complaint. So it's just not true to say that plaintiffs have not alleged with specificity people who were involved and had this knowledge. SRO rules. Plaintiffs have never contended that the violation of an SRO rule is itself a cause of action. The case law in Jolly, as Mr. Gifford discussed, talks about how these SRO rules can be used in a Section 10B claim context for determining what is the standard of care that can, if breached, constitute a deceptive act under Section 10B. The reason why these SRO rule violations are not themselves causes of action is because of the concern that they could be violated without the requisite state of mind. And so plaintiffs have been very clear that they are using the SRO rules simply for the element of deceptive conduct, that they had a duty to disclose. The failure to do that was itself deceptive conduct. But recognizing that plaintiffs still have to meet the scienter requirement of Section 10B, and we believe that we have done that. The issues of Janus Capital, Southland, Owens, you know, this is one of the unique things about this case. It is not a statement case. We are not pointing to a statement and saying that statement is the deceptive conduct. It's a nondisclosure case where there is no statement in violation of a duty to disclose, and that completely changes the legal analysis of this case. The cases like Janus Capital and Southland and Owens dealing with group pleading and this idea of specifically identifying who was the maker of the statement, those cases deal with statements, you know, cases where statements are the deceptive conduct. And you need to make sure that the individual who you are tying to that statement had the requisite state of mind. And so that is not this case at all. I have to show that a person who failed to disclose had a certain state of mind. Well, so the state of mind, plaintiffs alleges severe recklessness as recognized in this circuit and that the standard that should have been met was the placing of these securities, or actually of the issuer, on the legal restricted list. That's the standard. So then the question is, is it an extreme departure from that standard for UBS not to have put Enron on its legal restricted list, and especially in light of it putting into the market $400 million of risk that it held, we believe that it is. Thank you for your time. I think you still have to show that they had some knowledge before that. Well, and that's the purpose of the transactions in the complaint, is to show the knowledge that UBS gained, specific knowledge of Enron's financial manipulations and with specificity of who at UBS was actually involved in those transactions. And that's the list that I gave you. So in that list and what you now are citing, that's where we'll find a person who had. There's a section in the complaint. There's knowledge. That is knowledge. It goes through the transactions, talks about Enron's transactions that UBS participated in, not because of scheme liability, but for knowledge. And then involved in that was also the credit risk officers who were managing UBS's, the entire organization's risk to Enron. And it was their decisions to make sure that UBS got rid of its exposure. I appreciate your time. Thank you all very much. The case is heard this morning.